## FRED BOTKIN v. STATE.

No. A-2855—Opinion Filed July 19, 1919.

Rehearing Denied January 12, 1920.

(185 Pac. 835.)

1. **APPEAL AND ERROR—Indictment and Information—Overruling Demurrer to Information—Review.** Where it is alleged that the trial court erred in overruling a demurrer to the information, in order to save the question for review on appeal, such alleged error should have been incorporated as a ground for new trial, and presented as error in the petition. Where this is not done, and the information is substantially in the language of the statute, no ground for reversal of the judgment is presented.

2. **SALES—"Conditional Sale"—"Bailment with Power of Sale."** A contract under which the owner delivers property to another to sell, and which provides that the title to the property shall remain in the owner until sold to an actual purchaser, with the understanding that a certain amount of the proceeds of all sales and all property not sold shall be returned to such owner, im-

posing no obligation upon the other party to pay the purchase price for any of the property, constitutes a bailment with power of sale, and not a conditional sale.

3. **APPEAL AND ERROR—Technical Error—Reversal.** A judgment of conviction will not be reversed on account of the admission of irrelevant evidence, unless, after a full consideration of the entire record, it clearly appears to this court that the trial has probably resulted in a miscarriage of justice, or that the defendant has been deprived of some constitutional or statutory right.

4. **EMBEZZLEMENT — Conviction—Sufficiency of Evidence.** In prosecution under Rev. Laws 1910, sec. 2674, making any one intrusted with any property as bailee, or with power of attorney for its sale, etc., who fraudulently converts it or its proceeds to his own use, etc., guilty of embezzlement, evidence, based on defendant's appropriation of an automobile to his own use and his disposal of it, **held** to sustain a conviction.

*Appeal from District Court, Garfield County; James B. Cullison, Judge.*

Fred Botkin was convicted of the crime of embezzlement, and he appeals. Judgment affirmed.

*H. J. Sturgis* and *H. G. McKeever,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON, J. This is an appeal from the district court of Garfield county, wherein the defendant, Fred Botkin, was convicted of the crime of embezzlement, and sentenced to serve a term of 18 months' imprisonment in the state penitentiary.

The prosecution was founded on section 2674, Rev. Laws 1910, which provides:

"If any person being intrusted with any property as bailee, or with any power of attorney for the sale or transfer thereof, fraudulently converts the same or the

proceeds thereof to his own use, or secretes it or them with a fraudulent intent to convert to his own use, he is guilty of embezzlement, whether he has broken the package or otherwise determined the bailments or not."

The charging part of the information substantially follows the language of the statute, and although demurred to in the lower court, the overruling of the demurrer, while urged as error here, cannot be considered seriously as a ground for reversal of this judgment, for the reason that defendant's counsel did not properly save the ground by presentation of the same either in the motion for a new trial in the lower court or in the petition in error in this court. Suffice it to say that we are of the opinion that the information, while somewhat prolix, sufficiently charges the offense of embezzlement by a bailee under the requirements of our statutes and the previous decisions of this court.

There is but one alleged ground of reversal urged in the brief of counsel for defendant and assigned in the petition in error of sufficient merit to be seriously considered in this opinion. The defendant requested the court to direct a verdict of not guilty, which the court refused to do, and to which an exception was saved, and which is here urged as ground for reversal. This presents a mixed question of law and fact. It is contended on behalf of the defendant that the relation of bailor and bailee never existed between him and the Carhart Motor Company, whose property he is alleged in the information to have embezzled, but that the relation between them was that of debtor and creditor, and that, if there is any liability on his part to the Carhart Motor Company, it is a civil liability, for which no criminal prosecution would lie.

On the other hand, the contention is urged on behalf of the state that the relation of bailor and bailee did exist between the Carhart Motor Company and this defendant embezzled the property of the Carhart Motor Company as alleged in the information. The evidence in support of each contention is in substance as follows:

T. F. Debruler testified relative to the contract with defendant substantially as follows:

"I told him that I wanted to come into Enid with the Overland line, and it was necessary for us to have a representative here, and that I would make him an agreement on this matter this way: That I would make him a price of $785 on our Model 81, touring, and $950 on our Model 80, touring. I would make a contract with him whereby he was to pay us the net cost of these cars at that amount, and all over that amount that he received was his, and that he was to remit to us for the cars as he sold them, and they were our property and the property of the Carhart Motor Company. He was to bear all expenses of selling the cars, and we would help him sell the cars here. In fact, I agreed personally to help him sell them."

In a conversation with Botkin in the presence of Mr. Worthington at the Oxford Hotel on the same day, the following took place between Botkin and Debruler:

"I merely repeated the same proposal as I have just stated in the presence of Mr. Worthington, but stipulated that this would only be binding until I returned—well, until the return of Mr. Carhart, who was in the East at the time, and upon his return, that I would want him to come to Oklahoma City and meet Mr. Carhart, and have Mr. Carhart ratify this deal of mine."

Botkin told Debruler that he would take the difference between what "we charged him for these cars and what he sold them for as compensation."

"I told him that immediately upon the sale of an automobile, or where he had a prospect sold, that he should remit the $785 for Model 81, or $950 on the Model 80, and he agreed to do it; he said he would. The title was to remain ours. The cars were our cars. I told him that these cars were to remain the property of the Carhart Motor Company until we received settlement, $785 on one model and $950 on the other, and then we would pass title. He agreed to it."

About two or three weeks later, witness Debruler heard a conversation between Mr. Carhart and Mr. Botkin in Oklahoma City, in the office of the Carhart Motor Company, as follows:

"Mr. Carhart asked Mr. Botkin what arrangements I had made with him in Enid. Mr. Botkin told him that I had quoted a price of $785 on Model 81 and $950 on Model 80, and that we were to receive that amount of money for every car that Mr. Botkin placed in the Enid territory, and all over that price was his compensation for selling cars for us. Mr. Carhart told him that he thought it was good territory and had not been handled properly, and that with hard work and the line-up it ought to be a good selling proposition, and talked to him along those lines. I can't remember the exact conversation. * *. * Mr. Carhart asked him if he understood that these cars were our property and that the cars were to be placed up there under my supervision, and that we were to receive the amount of money as mentioned immediately upon the sale of any car; that they were our property and we were to carry the insurance on them at Oklahoma City, we bearing that expense ourselves—they stood on our books insured—and Botkin agreed to that."

E. S. Worthington testified as to the contract between Tom Debruler and Botkin as follows:

"Well, Tom told him that he would make an arrangement which was later to be ratified or turned down by

Mr. Carhart, for the sale of Overland cars in this territory, whereby Fred was to sell the cars. Model 81, which retailed at $925 delivered in Oklahoma, was to be handled by him on the basis of $785. All above that was to be his profit or commission for selling the cars. The Model 80, the larger car, which retailed at $1,150 in this territory, was to be based on the price of $950. All above $950 Fred was to get for his pay for selling it. That the ownership of the cars was to rest with the Carhart Motor Company. The cars were to be the property of the Carhart Motor Company, and were to be placed up here for sale, and Fred was to sell them."

E. R. Carhart states in substance the contract with Botkin to be about as follows:

"Mr. Debruler stated to me, after introducing Mr. Botkin, that he had been unable to secure a satisfactory dealer in Enid and who would meet with our requirements, and that as Mr. Botkin had had some experience in selling cars and seemed to be well acquainted with the people in the territory, he thought that he would be able to do some business, especially as he needed to do some business at that time as he wasn't very well fixed for money, and that he had made him a tentative proposition, as Mr. Debruler has stated. Those terms were what he told me; $950 on the $1,150 car, when sold. It was to be remitted to us; $785 of the $925 car was to be remitted to us, and we would allow him to sell these cars in this territory up here, that was not covered by a regular dealer, until such time as we could get a good dealer. It was a temporary proposition entirely. My recollection of the whole transaction was that as Botkin had had experience in selling cars, and with Mr. Debruler in direct charge of this territory, as I had pointed—I had appointed him to spend more time here on account of not having a dealer, than in the other parts of the state where we had a dealer, that I thought that temporarily we would be able to keep up the Overland business in this territory until we could select or come in contact with a man who would meet our

requirements as an Overland dealer in this territory. That was the sum and substance of the proposition, that I was to send cars up here with the understanding— Q. Now, Mr. Carhart, when these cars were sent by you to Enid, who owned them?

"By. Mr. Sturgis: To which the defendant objects, for the reason that it is calling for a conclusion and an opinion of the witness. Let him state the facts.

"By the Court: Your objections are overruled.

"By Mr. Sturgis: To which the defendant excepts.

"A. I owned them. Q. From whom did you purchase them? A. I purchased them from the Willys-Overland Company. Q. Did any person, other than you, have any interest in the cars at the time that they were sent to Enid by you? A. No, sir; no one else had. Q. Did anybody have interest in car Model 80, No. 14376, besides yourself, when you sent the car to Enid? A. No, sir; not a cent's worth. Q. Now, Mr. Carhart, you stated a moment ago that until—that under your arrangement, the cars were to remain your property when sent to Enid. When, if at any time, was the title to pass to somebody else? A. The title was to pass when they were paid for. Q. And up until that time, under your arrangement that you had about these cars, where was the title to be?

"By Mr. Sturgis: To which question the defendant objects, for the reason that it is calling for a conclusion and an opinion of the witness, and for the further reason that the same is wholly incompetent, irrelevant, and immaterial.

"The Court: Your objections are overruled.

"By Mr. Sturgis: To which ruling defendant excepts.

"A. They were to be in my possession at all times until paid for as I stated, and furthermore I was very explicit regarding that by asking him to be very careful re-

garding the use of them and in demonstrating, as they were not his property. It would make a secondhand car out of a new car very quickly, if it wasn't handled carefully. Q. What did he say when you made that statement? A. He thought that he could do and would do some business. I don't remember his exact words. I told him to go to it. * * * Q. When he sold a car, he became indebted to you for the amount of the car, your price $785 or $950, is that correct? A. He was to turn me over that much money for the car whenever he sold it. Q. When it was turned over to him, you issued him a bill of sale for it, did you not? A. I did. Q. What you call a bill of sale, which was a receipted bill? Is that correct? A. When the car was sold; yes, sir. Q. When he reported that a car was sold, and remitted you the proceeds that were derived from the sale of the car you made out what you have termed a 'bill of sale,' which says, 'Sold to Fred Botkin one Overland automobile, and a certain number and the price, and credited it as paid?' Isn't that the way it was done? A. Either to Mr. Botkin, if we did not know the owner's name, or to the owner direct, yes, sir, on payment. Q. How many cars did Botkin sell in this territory? A. He sold 20 cars, I believe. Q. Something like 20 cars? A. Yes, sir; he sold something like 20 cars. Q. How many of them had bills of sale? On how many of them was one of these so-called bills of sale issued to the purchaser? A. I don't know that. Q. Don't your books show, and don't you know that your books show, that in nearly every instance, these cars were sold and your books show that they were sold to Fred Botkin? A. Nearly all of them show that the cars were sold—that the bill of sale was made out upon payment to Botkin; yes. Q. In particular, for instance, the price of the car; that is, your net price of $785 or $950 was paid to you by Mr. Botkin? A. I think so; yes, sir. In some cases, the customer came down and settled for it direct."

The defendant, Botkin, testified in part·

"A. Debruler said: 'Botkin, something special has got to be done. This is a good territory, and you say that you are not able to finance it, and as we can't get any dealer here, I will make some kind of a special deal with you.' This was at the Enid Auto Company that we telephoned Mr. Killoren. I think it was, and Mr. Worthington was also there. We returned to the Oxford Hotel and in the lobby, Mr. Worthington said: 'Boys, I have got to do some writing, and you and Tom (meaning Mr. Debruler) can go up to my room and talk the proposition over.' So Mr. Debruler and I went to his room, and he told me just how it was. He said: 'Now, Botkin, Carhart is in New York City (I believe he said) ; but he always leaves everything up to me, and I am going to make you a proposition that is absolutely against our motto of doing business.' He said also: 'Now, if this proposition that I make you, on Mr. Carhart's return, if Mr. Carhart does not approve it, or approve of it, we will have to make other arrangements.' I said: 'All well and good. That will be all right with me.' So he went on to tell me. At that time, there was nobody in the room but Debruler and I, and at that time my wife was very poorly, and I told Debruler—well, in fact, we had talked a little about whether I should come to Oklahoma City, or whether the cars would be delivered to me here; and so he made the proposition to deliver the cars to me here at Enid. Q. What was the proposition he made to you? He said: 'Being you say you can't get away, and working single-handed would be rather inconvenient.' As it was rather inconvenient for me to go to Oklahoma City to get cars and extra expense, I would rather have had them delivered to me here at Enid. He said: 'Botkin, I will make you Model No. 81 at $775. I will make you Model No. 80 at $950.' Q. Was there ever any change made in that price of $775 that he made you there? A. Yes, sir. Q. It was afterwards raised to what? A. I will come to that. He says: 'We will deliver them here to you at Enid.' So I accepted the proposition. He says: 'I will stay here and help you out and get you started, because you know

two heads are better than one any time.' So about that time Mr. Worthington came into Debruler's room. He says: 'Ed, I took a shot at Botkin in this way.' Then he told him what I have previously said. Worthington says: 'I believe you're all right. That is a good proposition for both you. I am satisfied that Botkin can sell the stuff, and as we have never had this territory before, we need somebody that is well acquainted with it.' Mr. Debruler says: 'Worthington, Botkin, under the situation, can't very well go to Oklahoma City with us; but we will beat it for Oklahoma City and bring him up two cars.' They did do that. Q. How soon did they bring the cars up? A. They left the next afternoon; they returned with two cars. Mr. Worthington says: 'I am not much of an automobile driver, but I will take a shot at it.' The fact of the matter was that it made Mr. Worthington sick. It shook him up. He is a little frail fellow, and he was not used to it, and it made him sick. When they came back to Enid with these cars—I can't just recollect whether I met them at the—I believe they was at the Enid Auto Company, and I wasn't there, and when I come to the Enid Auto Company, they told me that the boys had got in with my cars. So I telephoned over to the Oxford Hotel and they came over there with the cars. The model No. 81 I had never seen. Of course, naturally, selling them, I was anxious to see the car. They went back to the hotel, and said that after supper they would see me. They turned the Model No. 81 over to me. I took Model 81 right there. They went back to the hotel, and in the evening Mr. Debruler brought the Model No. 80 over to where I was going to keep the cars. Q. Where was that? A. It was at the Enid Auto Company. Q. How soon was that, after the time you made the arrangement at the Oxford Hotel, that they delivered these cars? A. Well, the next day; the next afternoon or evening. Q. At the time when you had this conversation with Mr. Debruler at Oxford—at the Oxford Hotel—where he made this proposition, what was said, if anything, about the manner in which you should pay for these cars? A. Yes, sir. He told me

that, after I sold the cars, I could pay $775 for one model and $950 for the other. Q. Was there anything said there about the title remaining in Mr. Carhart or the Carhart Motor Company? A. No, sir; there was not. Q. Now, did you immediately enter upon the business of selling these cars after they delivered these two cars to you here? A. I did."

Briefly stated, the contract between the Carhart Motor Company and the defendant, Botkin, according to the witnesses for the state, was to the effect that the Carhart Motor Company, located at Oklahoma City, was to deliver to Botkin certain models of the Overland make of automobiles, which the said Botkin was to retain, in his possession until sold, and immediately upon sale to remit to the Carhart Motor Company, for one type or model of car the sum of $785 of the purchase price, and for the other type or model of car the sum of $950 of the purchase price, the balance above said sums to be retained by the said Botkin as compensation for his services in selling said cars. The state's witnesses testified that the retail price of one model was $925, and the other model $1,150. The property rights in said cars were to remain at all times in the Carhart Motor Company until a sale was perfected by said Botkin to private purchasers, at which time the Carhart Motor Company was to issue a bill of sale upon payment of the purchase price either to Botkin or to the party purchasing the car from Botkin as desired. In the event no sale was made, the Carhart Motor Company was to be returned the unsold cars.

There was no obligation on the part of Botkin to pay for these cars, but only to account for the proceeds received upon sales to others according to the stipulated price for each model. The Carhart Motor Company had

no power to compel Botkin to take any of these automobiles, or to pay for any of them, and either party had the right to terminate the arrangement at any time. Clearly it was not the intention of the Carhart Motor Company that Botkin should ever own any of the automobiles or pay the purchase price for them individually. It was the intention of the parties, from the terms of the contract as testified to by the state's witnesses, that the automobiles should remain the property of the Carhart Motor Company until sold to an actual purchaser by Botkin, and, unless sold, the automobiles were to be returned to the Carhart Motor Company.

The testimony of the defendant shows an entirely different contract, to wit: A sale by the Carhart Motor Company to Botkin of the particular models, one for $775 and the other for $950, trusting the said Botkin to pay for said cars whenever he had sold the same to a third party; the Carhart Motor Company retaining no property rights whatever in said cars. In other words, the defendant contended that the Carhart Motor Company, without any security whatever from him, sold him from time to time automobiles of a very considerable value, on his promise to pay for the same at a future time.

The issues thus joined between the state and the defendant were clearly and fully presented to the jury by court's instructions and the conflict between the evidence on the part of the state's witnesses and that of the defendant was settled by the verdict of the jury finding the defendant guilty, so that the only question presented is whether or not the evidence on the part of the state's witnesses is sufficient to support a conviction of the crime charged.

We believe that the state's evidence clearly establishes the relationship of bailor and bailee between the said Carhart Motor Company and the defendant, Fred Botkin; that there was an express agreement that the automobile which he is charged to have embezzled in this case was delivered to him with the understanding between him and the Carhart Motor Company that he was to sell the said car and remit or return so much of the proceeds of the sale to the Carhart Motor Company. At no time did the defendant have any property rights in the thing sold; he merely had possession of the same under his agreement to sell, and if the thing was not sold, it was to be returned to its rightful owner, the Carhart Motor Company. These facts constituted a bailment, and the evidence is undisputed that the defendant fraudulently converted the property to his own use in violation of his agreement for the sale of the same. Cases in point are: *Norris et al. v. Boston Music Co.*, 129 Minn. 198, 151 N. W. 971, L. R. A. 1917B, 615; *In re Columbus Buggy Co.*, 143 Fed. 859, 74 C. C. A. 611; *In re Flanders*, 134 Fed. 560, 67 C. C. A. 484; *In re Galt*, 120 Fed. 64, 56 C. C. A. 470; *Ellers Music House v. Fairbanks*, 80 Wash. 369, 141 Pac. 885; *Com. v. Harris*, 168 Pa. 619, 32 Atl. 92.

In the case of *Norris et al. v. Boston Music Co., supra*, it is held:

"A contract under which the owner delivers property to another to sell, and which provides that the title to the property shall remain in the owner until sold to an actual purchaser, and that all property not so sold, and the proceeds of all sales, shall be returned to such owner, and which imposes no obligation upon the other party to pay the purchase price for any of the property, constitutes a bailment with power of sale, and not a conditional sale."

The other decisions cited are substantially to the same effect, and sustain the state's contention that the relationship existing between the Carhart Motor Company and the defendant, Botkin, was that of bailor and bailee, and as the evidence on the part of the state is sufficient to support the conviction, the court did not err in overruling the defendant's motion to direct a verdict in his favor. While, under the defendant's testimony, he would have been entitled to an acquittal, it was for the jury to say whom they would believe and whom disbelieve.

The contention that the court admitted certain incompetent and irrelevant evidence concerning the condition of the car after the defendant had appropriated it to his own use and driven it to Miles City, Mont., where he afterwards disposed of the same, is without merit. The contention here urged is that such evidence had a tendency to inflame the minds of the jury against the defendant; but as the punishment imposed was only 18 months' imprisonment, and the evidence discloses, if the state's witnesses are to be believed, a clear case of guilt, supported by the actions and conduct of the defendant himself, it cannot be said that there was a miscarriage of justice by the conviction of the defendant under the facts of this case, and while the evidence complained of sheds no light on the material facts of the case, its admission cannot be said to be prejudicial to the substantial rights of the defendant, in view of the light punishment imposed.

For the reasons stated, the judgment is affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.